```
 1              UNITED STATES DISTRICT COURT FOR THE

 2                  NORTHERN DISTRICT OF OKLAHOMA

 3

 4   GLOBAL ONE ENGINEERING, LLC,    )
                                     )
 5               Plaintiff,          )
                                     )
 6   vs.                             ) CASE NO. 15-CV-583-CVE-FHM
                                     )
 7   SITEMASTER, INC.,               )
                                     )
 8               Defendant.          )

 9

10

11

12              TRANSCRIPT OF PROCEEDINGS
                    DECEMBER 9, 2016
13     BEFORE THE HONORABLE CLAIRE V. EAGAN, JUDGE PRESIDING

14                 EXCERPT OF JURY TRIAL
          THE TESTIMONY OF MICHAEL JAMES BERRYMAN
15

16

17              A P P E A R A N C E S

18   FOR THE PLAINTIFF:          MR. JAMES P. McCANN
                                 MR. CLAYTON J. CHAMBERLAIN
19                               McDonald McCann Metcalf
                                 & Carwile LLP
20                               15 E. 5th Street
                                 Suite 1400
21                               Tulsa, OK 74103

22   FOR THE DEFENDANT:          MR. ANDREW ADDISON SHANK
                                 MS. HEIDI L. SHADID
23                               Eller & Detrich
                                 2727 E. 21st Street
24                               Suite 200
                                 Tulsa, OK 74114

25
```



```
 1                          INDEX

 2   ---------------------------------------------------------------

 3   MICHAEL JAMES BERRYMAN

 4            DIRECT (By Mr. McCann) ........................  4
              CROSS (By Mr. Shank) ......................... 52
 5                      * * * * * * * * * *

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        MORNING SESSION
 2                       DECEMBER 9, 2016
 3   -------------------------------------------------------------
 4      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, OUT OF
 5   THE PRESENCE AND HEARING OF THE JURY:)
 6           THE COURT:  Okay.  We're on the record in open court,
 7   outside the presence of the jury.  Counsel and the parties are
 8   present, and counsel would like to have a conference.  Yes?
 9           MR. SHANK:  Your Honor, we just wanted to inform you,
10   based on the way the evidence has transpired, we don't see the
11   need to call Mr. Rogers on our witness list.  That will leave
12   -- and we think -- counsel and I believe we'll get through
13   Mr. Berryman and Mr. O'Brien today.  That will leave Mr. Tavel
14   as our witness.  He has travel constraints.  He'll be here
15   Sunday evening.
16           THE COURT:  All right.
17           MR. SHANK:  Our last witness will be --
18           THE COURT:  Monday.
19           MR. SHANK:  -- first thing Monday morning.
20           THE COURT:  All right.  And at some point today I'll
21   give you the jury instructions.  I'll tell you they're not
22   dissimilar from the ones you submitted.  We used OUJI.  So I'll
23   give you those and we can decide whether we want to have the
24   instruction conference this afternoon so you'll know exactly
25   what the instructions will be or whether you want to wait and
```

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - DIRECT                            4

```
 1  have it Monday morning.  Okay?

 2        MR. SHANK:  That will be fine, Your Honor.

 3        THE COURT:  I don't think it's going to take you long

 4  to get through the instructions.

 5        MR. SHANK:  Excellent.  Thank you, Your Honor.

 6        THE COURT:  All right.  Thank you.

 7        THE COURT SECURITY OFFICER:  They're all here.

 8        THE COURT:  Okay.

 9    (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

10  THE PRESENCE AND HEARING OF THE JURY:)

11        THE COURT:  Next witness for plaintiff, please?

12        MR. McCANN:  Mr. Mike Berryman.

13    (WITNESS SWORN)

14        THE COURT:  Would you please state your name, and

15  spell your last name.

16        THE WITNESS:  My name is Michael James Berryman.

17  That's B-E-R-R-Y-M-A-N.

18        THE COURT:  Mr. McCann.

19        MR. McCANN:  Thank you, Your Honor.

20                  MICHAEL JAMES BERRYMAN,

21  being first duly sworn to testify the truth, the whole truth,

22  and nothing but the truth, testified as follows:

23                  DIRECT EXAMINATION

24  BY MR. McCANN:

25  Q.  Mr. Berryman, can you tell us, please, what is your
```

1  profession or occupation?

2  A.  Yes.  I am the president of Berryman Enterprises,

3  Incorporated, which is a general contractor firm that's based

4  in Oklahoma City, and I have been in that capacity for 38

5  years.

6  Q.  And, Mr. Berryman, describe generally the work of Berryman

7  Enterprises.

8  A.  Well, it's been involved in all sorts of construction

9  projects over the life of the company.  It's built banks,

10  churches, schools, retail, restaurants, apartment complexes,

11  municipal buildings.  It has been licensed in 22 states as a

12  general contractor.  It's currently licensed in six states as a

13  general contractor.

14  Q.  And, Mr. Berryman, have you, on occasion, in your 38-year

15  history, provided services as an expert witness in litigation

16  matters?

17  A.  Yes.  For about 18 years I have functioned as a litigation

18  expert on construction issues about the nature and causes of

19  damages, the sequencing of work, contract issues, the

20  relationship between general contractor and subcontractors, the

21  role of those parties, the role of engineers, architects, etc.,

22  in our industry.

23  Q.  And in that connection, have you provided, for those 18

24  years or so, expert testimony in both state and federal courts

25  throughout that period of time?

1   A.   Yes.

2   Q.   As recently as yesterday in Oklahoma City; correct?

3   A.   Actually, a couple of days ago.

4   Q.   Okay.  With respect to the period of time that you've been

5   providing services as an expert witness, have you ever been

6   denied the opportunity to testify as an expert?

7   A.   No.

8   Q.   And in terms of a percentage of your business, can you tell

9   us how much time you spend in the expert services area.

10  A.   I spend about three-fourths of my time working as an expert

11  witness on litigation matters, and about 25 percent of my time

12  operating the construction company.

13  Q.   And in your construction company business, you have other

14  personnel who work for you; correct?

15  A.   Yes.

16  Q.   Sir, were you retained by Global One Engineering, the

17  plaintiff in this case, to review and analyze issues in this

18  particular case involving a contract with SiteMaster to be

19  performed in or near Niscemi, Italy?

20  A.   Yes.

21  Q.   And in connection with your work in order to form an expert

22  opinion with respect to a variety of matters, can you tell us,

23  not every single point, but generally speaking, what documents

24  you were provided and referred to to arrive at your opinion.

25  A.   Well, I reviewed about 1,000 pages of documents concerning

1  the subcontract for the work to be performed, the award letter,

2  the terms and conditions of the contract, the purchase order

3  form, as well as numerous e-mails that transpired during the

4  course of construction.  I've looked at reports that were filed

5  contemporaneously on a day-by-day basis by SiteMaster, and also

6  by a company called CorroMetrics.  And I've read the expert

7  report that was written by SiteMaster's expert in this matter.

8  Q.  And after your review of that documentation, some of which

9  we may see during the course of your testimony here today, did

10 you issue various opinions with respect to matters concerning

11 the Niscemi tower project?

12 A.  Yes.

13 Q.  With respect to the opinions which you issued, you, of

14 course, prepare a report with respect to that; correct?

15 A.  Yes, a written report.

16 Q.  And do you know that those reports, over the 18 years that

17 you've been acting as an expert witness, are routinely provided

18 to the opposing parties, as well?

19 A.  Yes.

20 Q.  Now, with respect to your opinion that you rendered in this

21 matter, were you able to determine, based upon your review of

22 all of the thousand or more pages provided to you, make any

23 determination with respect to the work activities of Global One

24 at the Niscemi site in Italy?

25 A.  Yes.

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - DIRECT                                          8

1   Q.   And what, sir, was that opinion with respect to their work

2   and staffing and manning of the site in Niscemi?

3   A.   Well, from my read of the documents, it appeared that they

4   diligently pursued the work on an everyday basis, they properly

5   manned the job, and that for delays that were outside of their

6   control, which I would be happy to document for you, those

7   delays took away from the 99 contract days that they had

8   available and made it impossible to complete the job according

9   to the deadline.

10  Q.   Now, let me ask first about the 99 days that you refer to.

11  Do you recall what that period was and where you ascertained

12  that that was the period of performance?

13  A.   Well, it's in the contract documents, and it extends from

14  June 8th until September 15th of 2015.

15  Q.   And the 99 days encompasses that entire period of time,

16  seven days a week for however many weeks; correct?

17  A.   Yes.

18  Q.   As a result of reviewing the materials that were provided

19  to you, did you determine whether or not there were delays in

20  the performance of the contract that impacted the number of

21  days which Global One had to perform its work?

22  A.   Yes, I did.

23  Q.   And can you advise us what you were able to determine with

24  respect to that?

25  A.   Well, at a minimum, there were 46 days, 46 of the 99 days

1  for which it could be documented the time was lost.  So,

2  basically, about 45 percent of the time was lost for delays

3  that were outside Global One's control.

4  Q.  And when you say delays that were outside Global One's

5  control, is that a point that's of significance to you based on

6  your experience in the construction industry?

7  A.  Yes, because typically in construction contracts time is an

8  important element, and so if you're given 99 calendar days --

9  and it needs to be looked at in terms of calendar days -- if

10  you're given 99 days to complete a job and you need those 99

11  days, then if you lose some of those days for things that are

12  outside of your control, then you need to have those days

13  restored in order to be able to perform your work, because work

14  takes a certain amount of time, and if you take enough days

15  away, it becomes impossible to complete it in a timely fashion.

16  Q.  And is that what you determined in this case, that it

17  became impossible to complete it in a timely fashion because of

18  the 46 days of delay?

19  A.  Yes.  It became impossible because of the number of people;

20  there were six to eight people onsite.  And so when you look at

21  the days that were available, it would have been impossible for

22  six to eight people to complete the work in the number of days

23  that were available after the delays had occurred.

24  Q.  Okay.  Let's talk about some of the individual delays, if

25  we can.  Of the 46 days that are at issue in this particular

1  opinion which you have rendered, are some of them delays which

2  are exclusively, in your view, related to delays caused by the

3  Navy?

4  A.  Yes.

5  Q.  And actually, Mr. Berryman, we'll be projecting these on

6  the screen that's in front of you.  It will save you having to

7  hopefully --

8  A.  All right.

9  Q.  -- juggle with your large binder there.

10     What was the first delay that you recall in connection with

11 this contract that was caused by the Navy?

12 A.  Well, the start date was supposed to be June 8, 2015, and

13 14 days were lost right off the bat because Global One was not

14 allowed to mobilize and come to the project to get started

15 until June 22nd.  So, that's 14 of the 99 days, again roughly

16 14 percent of the time was lost before they ever arrived on the

17 job.

18 Q.  And, sir, let me show you what has previously been

19 marked as -- if you look up in the upper right-hand corner

20 there, you can see an invoice number, and for our shorthand

21 purposes that we've been using in this case, you see at the end

22 of the number is a -4?

23 A.  Yes.

24 Q.  So, from here on out, as I refer to some invoices, I'll

25 just be using that last number, because the other numbers

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - DIRECT                    11

1   remain the same.  All right?

2   A.  Yes.

3   Q.  Now, this particular invoice -- this is sensitive this

4   morning -- this particular invoice is the invoice that you're

5   talking about for the 14 days of delay; is that correct?

6   A.  Yes.

7   Q.  And you perhaps saw up at the top, as we were looking at

8   the invoice number, it appears that it has been paid by

9   SiteMaster.  Do you recall that?

10  A.  Yes, that's right.

11  Q.  And in this particular case, the total of the invoice for

12  the 14 days of delay is approximately just short of $66,000;

13  correct?

14  A.  Yes.

15  Q.  Now, in your mind, sir, do you place any significance upon

16  the fact that SiteMaster actually paid this invoice?

17  A.  Yes, because, in and of itself, that's evidence that, one,

18  it did occur and that it was legitimate.  And speaking from the

19  perspective of a general contractor, you're certainly not going

20  to pay an additional almost $66,000 for something that you

21  dispute or believe did not occur or wasn't legitimate.

22  Q.  And, sir, you said an additional amount of money to be paid

23  as a result of these delays.  Can you explain the concept of

24  delay payments in terms of what they bear in relation to the

25  overall contract.

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - DIRECT                                    12

1   A.   Yes.   In this matter, just in rough numbers, the starting

2   point was about a million dollars, and in the construction

3   industry we call that the base bid.   So the base bid in this

4   project was approximately a million dollars.   And then in this

5   project, as is somewhat typical, there are things added along

6   the way to the base bid.   Sometimes those are things like 10

7   more doors in a project.   Sometimes they are extra costs for

8   delays, because when you have a delay you still have personnel

9   that are being paid, you still have hotel rooms in this case

10  that are being rented, and so forth.   So, delays oftentimes

11  cause situations that have to be reimbursed, and so that

12  reimbursement is over and above the base bid.   So, that can

13  cause the million dollars in this case, over time, to climb,

14  and in this case eventually became somewhere around $1.2

15  million.   So, it's a million dollars for the base bid of the

16  work to be performed, and 200,000 more for the delays and other

17  things that happened along the way.

18  Q.   Now, with respect to the either delays or changes in the

19  means and method of performance of work that come up during the

20  course of the contract, is that the, in this case, the

21  approximately $200,000 additional amount that was added to the

22  base amount of the contract?

23  A.   That's right.

24  Q.   But in terms of performance on the contract, those

25  particular delays -- excuse me -- those particular payments are

1  not related to actual performance on the contract, are they?

2  A.  That's right.  I mean, for instance, this invoice that we

3  just looked at for $66,000, that doesn't come off the million.

4  That is an extra that's paid on top of the $1-million.  So

5  there's an important distinction there, that as these things

6  are added for delays, for extra work, changes in means and

7  methods, what have you, those are in addition to and are paid

8  separately from, through various different invoices, from the

9  $1-million.  It is not to be applied to the $1-million.

10 Q.  Let me show you another invoice, sir.  This one is the -5

11 invoice, and does this appear to be another invoice for a Navy

12 delay?

13 A.  Yes.

14 Q.  And do you recall, from your review of the documents, the

15 basis for this particular delay?

16 A.  Yes.  Beginning on June 27th, so 27, 28, 29 and 30, Global

17 One was delayed because the general contractor, SiteMaster, was

18 waiting on an approval from the Navy that is known in our

19 industry as an NTP, Notice To Proceed, and that is to get

20 approval from the Navy that the work plan, the rigging, what

21 was planned is safe and acceptable to the Navy, and you can't

22 go forward until you have that approval in hand.  Instead of

23 having that in hand at the time that Global One was ready to

24 get on the tower and get to work, there was a four-day waiting

25 period for the Navy to be forthcoming with that, and so the

1   invoice that you see here on the screen now is for those extra

2   four days.

3   Q.   And just like the earlier invoice that we saw, are these

4   charges again in the nature of those that get added to the base

5   contract?

6   A.   Yes.  Again, this is additional above the $1-million, does

7   not come off the base bid.  It's not a credit against the

8   million dollars.

9   Q.   The next invoice appears to be the invoice that is -6.  Do

10  you see that?

11  A.   Yes.

12  Q.   Also paid; correct?

13  A.   Yes.

14  Q.   And does this appear to be a Navy requirement associated

15  delay?

16  A.   Yes.

17  Q.   And what was the purpose of this one, if you know?

18  A.   Well, as I understand it, this is a one-day delay where in

19  the transit, meaning moving from your place of lodging coming

20  onto the job site, that there was a delay apparently because of

21  some sort of protest activity or potential protest activity

22  that knocked Global One out of working for this one day.

23  Q.   And, in fact, in reviewing both the CorroMetrics and the

24  SiteMaster daily work reports, there was no work report for

25  that day; correct?

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - DIRECT

15

```
1   A.   That's right.

2   Q.   Next I'll show you is the invoice that is marked -9.  Do

3   you see that?

4   A.   Yes.

5   Q.   Also paid?

6   A.   That's right.

7   Q.   And you see what this particular delay concerns?

8   A.   Yes.

9   Q.   And based upon your review of the records in the case, what

10  were you able to determine about this delay?

11  A.   Well, that on the island of Sicily where the tower is

12  located apparently there's a contingent of people in the

13  country that don't like it being there and they wanted to

14  protest, and so there were four days in early August where a

15  protest took place and it was apparently unsafe or ill-advised

16  for work to go on, so again, four days were lost by Global One,

17  not of their doing but for circumstances that were outside

18  their control.

19  Q.   So, with respect to the four invoices we've just reviewed,

20  those were all Navy-caused delays; correct?

21  A.   Yes.

22  Q.   And like these last two, like the first two, the same

23  information applies, it's an add-on to the base amount of the

24  contract but separate from the work milestones?

25  A.   Yes.
```

1    Q.   To summarize then, we have one delay for 14 days --

2    A.   Yes.

3    Q.   -- and then almost immediately thereafter the four-day

4    delay for the notice to proceed.  So, 14 and 4 are 18; correct?

5    A.   Yes.

6    Q.   And then we had the one day in July for the possibility of

7    a protest, so that makes it 19; correct?

8    A.   Yes.

9    Q.   And then the last four that we just talked about, add to

10   19, is 23 days directly attributable to a Navy decision not to

11   permit work during those periods of time; correct?

12   A.   Yes, that's right.

13   Q.   In addition to -- so that's, of the 46 days you mentioned,

14   that's half the days; correct?

15   A.   Yes.

16   Q.   And did you also make a review and look at other delays

17   which were involved in the particular case?

18   A.   Yes.

19   Q.   And can you describe generally the sort of categories, if

20   you will, into which those delays took place, and then we'll

21   discuss them individually.

22   A.   Okay.  I mean, they result primarily from things that would

23   be called changes in the scope of work.  The scope of work

24   being defined as what you're supposed to do.  So, the work

25   changed for what are known as the means and methods, which in

1  the construction business means how are you going to do the

2  work, what's your method, what's your means of performing it,

3  because when you bid a project, especially in this case, you

4  put forth, "This is how we intend to do the work," and then if

5  a change occurs as to how that work is going to be performed,

6  sometimes it causes a change in the cost because your costs go

7  up or the time goes up, and some more time can be required as a

8  result of the change, so that the rest of the delays have to do

9  with changes in the scope, what was to be done, and how it was

10 to be done.

11 Q.  With respect to these delays, did you review, among the

12 records that were provided to you, communications concerning

13 these delays about what happened?

14 A.  Yes.

15 Q.  And do you recall, as a result of that review, that there

16 were some discussions between the parties in the middle part of

17 July that addressed, among other things, some of these delays?

18 A.  Yes.

19 Q.  I'm going to show you in previously admitted joint trial

20 exhibit 20, at page 2, which is the start of an e-mail chain,

21 in this case an e-mail chain from Samantha Schaffer on Sunday,

22 August 16th, addressed to Mr. Bigger, the CFO of SiteMaster,

23 talking about a variety of issues.  Do you recall reviewing

24 that?

25 A.  Yes.  And for some reason that's not on my screen.

1            **THE COURT:** Is the screen not on?

2            **THE WITNESS:** No. I mean, it has been, but it's off

3    now.

4            **THE COURT:** Yeah, it's the wire. The plug.

5            **MR. McCANN:** The particularly sensitive wire at the

6    bottom there. You're not the first.

7    Q. (BY MR. McCANN) And after the first part of that, which

8    deals largely with costs of some spray guns and things like

9    that that we'll talk about in a moment, it continues on on page

10   4 to discuss a variety of issues. Do you see that, sir?

11   A. Yes.

12   Q. Now, the very first paragraph is the two-week delay.

13   You've already talked about that so we don't need to do that.

14       Take a moment to review the second paragraph and advise me

15   if that was one of the delays which you considered in arriving

16   at the additional 23 days that comprise the 46 after the Navy

17   delays.

18   A. Yes. Number 2 was also considered, and that's when Global

19   One got started, the previous subcontractor that had been on

20   the job, which was Northern Pride, was supposed to have left

21   rigging in place that would have made scaling the tower faster

22   and easier. That rigging had been taken down, so Global One

23   had to put it back up. That's something that they didn't

24   anticipate. It took a couple of days. Incidentally, they were

25   not paid more for doing that extra work, and it did take extra

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - DIRECT
                                                              19

 1  time.

 2  Q.  And I'm going to show you now one of the contractor reports

 3  that you recall having seen.  Do you recall that?

 4  A.  Yes.  What's the date on that?

 5  Q.  Oh, I'm sorry.  This particular one is June 22nd, their

 6  first day.  You can see it up at the top right there.

 7  A.  Yes.

 8  Q.  It's the first day on the project.  Do you see that?

 9  A.  Yes.

10  Q.  And do you see a reference here a little more than halfway

11  down the page that starts on the left, "Northern Pride did not

12  leave the ropes they agreed to leave on site for Global

13  One."  Do you see that?

14  A.  Yes.

15  Q.  And as a result of that, did that require, in your view,

16  additional effort that delayed the effective start because with

17  an 827-foot tower you've got to have the right ropes and

18  rigging to do it?

19  A.  Yes.  It not only affects your time line but it also

20  affects your cost, because as a person that bids on the project

21  you anticipate a certain work that you have to do for a certain

22  price, and when you show up and you've got to do more than you

23  anticipated because someone else failed to do something that

24  they were supposed to do, it, of course, puts more work on you

25  and more cost on you to overcome that.

1  Q.  Okay.  Paragraph 3 deals with the Navy delay, correct, on

2  getting the notice to proceed?

3  A.  Yes.

4  Q.  And why don't you review, if you would, please, paragraph 4

5  and tell us what determinations you made with respect to that

6  matter.

7  A.  Well, there are 24 anchors at the base of the tower that

8  needed to be prepped and painted also and it was discovered

9  after the work started that the degree of corrosion that was on

10 the anchors themselves required much more intensive work in

11 order to make them in an acceptable manner, and so additional

12 money was agreed to and paid by SiteMaster for the additional

13 work on these anchors.  It did take additional time also, and

14 so this is a note pointing out that it took at least two extra

15 days.  And in my review of the documents, I would believe that

16 it took more than two days, but we see here two days were

17 claimed.

18 Q.  But for purposes of your opinion, you accepted the two

19 days?

20 A.  Yes.

21 Q.  And, in fact, the change that is referred to there and the

22 fact that there was an increase in the contract, that was

23 actually a milestone change that was added to the base amount

24 of the contract; do you recall that?

25 A.  Yes.  Originally, the contract was a million dollars, but

1   as a result of this particular item on the anchors, the

2   contract was increased to a $1,011,615.

3   Q.   So that the addition of $11,615 was specifically to the

4   anchors?

5   A.   Yes.

6   Q.   Because of a change in the scope of work?

7   A.   Yes, and that was agreed to by SiteMaster.

8   Q.   And agreed to as acknowledged by their change in the

9   purchase order terms in the milestones there; correct?

10   A.   Yes.

11   Q.   With respect to the information contained in paragraph 5,

12   explain to me, if you would, how that played into your

13   determination of additional delay days.

14   A.   Well, during the project there were numerous discussions

15   about what it was going to take to actually get the tower

16   prepped in the manner that SiteMaster felt was necessary and so

17   there was a change in the means, methods, and to the degree

18   that scraping would occur to provide a proper surface.  And so

19   this number 5 talks about that going into the project one day

20   was allotted to do every 100 lineal feet of tower, meaning from

21   top to bottom it would be able to scrape it in nine days, but

22   instead, changes required it to be done more extensively, that

23   changed the time by nine days, and as you can see there, three

24   additional days were lost up front.  So, when you add all that

25   together, this spells a 12-day delay.

1   Q.   And in this connection, among the changes being considered

2   was an approval by SiteMaster to use power tools with wire

3   wheels in order to clear the loose and flaking paint on the

4   tower.   Do you recall that?

5   A.   Yes.

6   Q.   And the use of power tools and wire brushes that just

7   attach to the power tool were not a means and methods of

8   performance specified in the award letter, were they?

9   A.   That's right.   Originally, what would be important when you

10  bid a project like this is to have an understanding of how you

11  want the work done.   In other words, the tower could have been

12  scraped all the -- or could have been sandblasted all way down

13  to raw metal if that's what somebody wanted to do but it would

14  have been a lot more expensive.

15      So, as Global One considers, "What can we do this job for,"

16  to the degree that the Navy wants it done or to the degree that

17  SiteMaster wants it done is an important consideration.   Going

18  in, it was supposed to just be hand-scraped.   Well, if you

19  elevate that now to using power tools, of course that's going

20  to be more time consuming, and you've got to think about how to

21  get power to the tools, you've got to either have extension

22  cords that run from a generator or you've got to have battery

23  operated devices, and so it becomes more intensive, more time-

24  consuming, and more expensive.

25  Q.   With respect to the sixth paragraph, were you aware, first

1  of all, that the award letter in this particular case

2  contemplated the use of mitt painting for both the priming and

3  painting of the Niscemi tower?

4  A.  Yes.

5  Q.  And did you become aware that there was a point in time

6  when the decision was made apparently to switch that method and

7  means of performance?

8  A.  Yes.

9  Q.  In what respect, sir?

10 A.  Well, originally, it's was contemplated to be mitt painted.

11 It was switched to spray to get a more aesthetically pleasing

12 look on the tower.  And so that change and how to do the work,

13 spray versus mitt, is something that came pretty much in the

14 mid point of the project.

15 Q.  And in terms of that change to spray painting which you

16 described to have a -- to improve the look or the aesthetics of

17 the tower, did you see any indication in the scope of work that

18 the appearance or aesthetics with respect to the tower was a

19 contractual requirement?

20 A.  No, it's not a contractual requirement.  Instead, what you

21 see in the documents when you look at them as a whole, that the

22 reason for painting the tower in the first place was to make

23 sure that it would be visible by planes so that they wouldn't

24 hit it, and for corrosion control, not for aesthetics.

25     And so, mitt painting, which of course is not going to look

1   as finished as a spray --

2           **MR. SHANK:**  Can we approach, Your Honor?

3           **THE COURT:**  Yes.

4       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUT OF

5   THE HEARING OF THE JURY:)

6           **MR. SHANK:**  This is very well documented.

7           **MR. McCANN:**  I'll stop it.

8           **MR. SHANK:**  He has nowhere to go with this.

9   Absolutely nowhere.

10          **MR. McCANN:**  I'll stop.

11          **THE COURT:**  You can talk to him.  Go ahead.

12          **MR. McCANN:**  May I talk to him?

13          **THE COURT:**  Yes.

14      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

15  THE PRESENCE AND HEARING OF THE JURY:)

16  Q.  (BY MR. McCANN)  In connection with the information that

17  relates to item 6 about the change from mitt painting to spray

18  painting, what opinion did you draw simply with respect to the

19  delay days that were occasioned by that change and why those

20  days are, in your view, appropriate to consider as delay days?

21  A.  Well, because it took time to figure that out and get it

22  moving.  In other words, just like it says here, a couple of

23  days to try out -- there was a spray gun that was onsite,

24  because you've got to -- you've first got to back up and

25  realize that Global One didn't come to this project prepared to

1  spray; they came prepared to do mitt painting.  So, to change

2  to spray, they had to work with the contract officer for the

3  Navy as to what spray gun would be acceptable, and then they

4  had to locate one that was local.  The local gun didn't perform

5  very well because it was probably worn or defective in some

6  manner.  And then they had to order guns and have them shipped

7  in to Italy as quickly as possible, and so there were delays in

8  switching from a means of mitt to spray that were -- that

9  couldn't be avoided; it is just something that happens when you

10 switch gears like that.

11 Q.  And based upon the information in paragraph 6 upon which

12 you relied, and the decision to change from mitt to spray

13 painting, did you agree that a total of two days for attempting

14 to find different mitts, two days for fixing the spray gun that

15 was obtained locally that was a used one, and then another two

16 days to basically learn the spray painting system, were, in

17 your view, reasonable delay days?

18 A.  Yes.

19 Q.  And that also formed part of your opinion, did it not?

20 A.  That's right.

21 Q.  Going on to page 5 of exhibit 22, we see up at the top in

22 paragraph 7, that's the no transit court decision day on July

23 9; correct?

24 A.  Yes.

25 Q.  That you've already testified about.

```
 1      And then there's an indication of a loss of one day due to

 2  an e-mail for a change in the desire of which bands were to be

 3  completed.  Do you see that?

 4  A.  Yes.

 5  Q.  And what do you understand that to be?

 6  A.  Well, late in the project, when SiteMaster realized that

 7  the project couldn't be completed on time, there was discussion

 8  about how to change the sequence of which bands would be

 9  painted, and there was discussion back and forth over a one-day

10  period about how that sequence would be changed and what would

11  be the new marching orders going forward.

12  Q.  Okay.  Was that, in your view, a basis for a change -- or a

13  delay caused as a result of that decision?

14  A.  Yes.

15  Q.  And did that involve basically the rerigging of the shroud

16  to some other location?

17  A.  Yes.

18  Q.  Going back for a moment, just while it's still fresh in our

19  minds, this decision to change from mitt to spray painting, did

20  that also result in some additional charges in the nature of a

21  change?

22  A.  Yes, it did.

23  Q.  I'll show you what is marked as exhibit 11.  It's indicated

24  as paid; correct?

25  A.  Yes.
```

1  Q.  And here you see that the changes include charges for tower

2  spraying costs to switch to Graco systems, about $57,000; paint

3  and materials to continue spraying, about $15,000; and then

4  there's an additional employee mobilization, as well?

5  A.  Yes.

6  Q.  And like the other delay type payments that we have talked

7  about, is this a payment apparently paid by SiteMaster as a

8  result of the change that is an outside-the-milestones-of-

9  the-contract payment?

10  A.  Yes.  This would be recognized as a change to the base bid,

11  which was originally about a million dollars, and that change

12  to the base bid is over and above the one million.  It's

13  essentially saying, "We've recognized that a change has been

14  made and we're going to compensate you for that," and that's

15  what this invoice is for.

16  Q.  Now, to compensate them for that is just for the costs of

17  the goods and equipment, since those were not originally

18  contemplated or required by the scope of work; correct?

19  A.  That's right.  I mean, this does not make any sort of

20  allowance for "we will extend more calendar days to complete

21  the project," most likely because more calendar days were not

22  available.

23  Q.  Okay.  I believe those are all of the -- when you add up

24  the numbers that are reflected on the exhibit 20 where we were

25  going through the e-mail plus the invoices and so forth that

1  add up to the 46 days; is that correct?

2  A.   That's right.

3  Q.   Now, in addition to that, none of the delays which you

4  considered in saying there was at least a 46-day period of

5  delay included any weather-related delays, did they?

6  A.   No.

7  Q.   But you do know that there were weather-related problems

8  with proceeding to work, as well, don't you?

9  A.   Yes.

10 Q.   Okay.  With respect to your opinion that you believe that

11 there are 23 days of delays caused by the Navy for which Global

12 One was not responsible, do you also believe that with respect

13 to the other 23 days that you've identified and we've just

14 talked about, that those were either as a result of changes in

15 the means and methods of performance or changes in the scope of

16 work that were not the fault of Global One?

17 A.   Yes, that's accurate.

18 Q.   So, if you accept the proposition that there are 46 days

19 total, as your opinion does, of delays that are not caused by

20 or the responsibility of Global One, what effect does that have

21 on the 99 days period of performance in the contract?

22 A.   Well, it basically takes away about half the time that was

23 allotted to do the work and, in my opinion, makes it impossible

24 to complete it on time.

25 Q.   Now, you know -- or you knew in this case, did you not,

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - DIRECT                           29

 1  that there was a -- you know, the Navy had wanted to get this

 2  site up and running again; correct?

 3  A.  Yes.

 4  Q.  And so that the September 15, 2015, for the portion of work

 5  being done by Global One was a hard, immovable deadline from

 6  the Navy's perspective; do you agree?

 7  A.  Yes, because there was a contractor to follow from

 8  September 15 to September 30, and it's my understanding that on

 9  September 30 or October 1st that this tower needed to be up and

10  transmitting for military purposes.

11  Q.  And what is the custom and practice in the industry, if you

12  have a 99-day period of performance, what is the custom and

13  practice in the construction industry if you had to use this

14  specific hypothetical 46 days of delay on a 99-day period of

15  performance?

16  A.  Well, you'd simply have to add those days onto the back

17  side.  So, for instance, up front, if you had a 14-day delay

18  right out of the box, then you would have to add that onto the

19  contract time and it would extend the contract time from

20  September 15 to September 29th for that first delay, and so

21  forth for the second delay and the third delay and the fourth

22  delay, those days would simply be added onto the back.  So,

23  money would be tendered for the delay and time would be allowed

24  on the back side of the contract.

25  Q.  The fact that money is tendered for any of these delays

1   really is only to compensate for, in effect, idle time;

2   correct?

3   A.  Well, it's to compensate for additional costs that arise

4   because of the delay or the change.  So if you delay 14 days on

5   the front side, you have people hired, they're there, they're

6   in hotel rooms, Global One's costs go on regardless of the

7   delay, so to the extent that those costs go on, they have to be

8   reimbursed and that's why these reimbursements occur.  But what

9   hasn't happened here is no additional time was put on the tail

10  end of the contract.

11  Q.  Now, did you review, during the course of these discussions

12  in mid August between SiteMaster and Global One, did you review

13  some of those communications back and forth?

14  A.  Yes.

15  Q.  Was there ever any communication back and forth that would

16  permit the add-on of the days on the back side, to use your

17  words, that were lost as a result of delay or changes in the

18  means and method of performance?

19  A.  No.

20  Q.  Okay.  So that the true finite period of time then that

21  would have been available, assuming every single day was used

22  to complete this contract given those delays, is really 53

23  days; correct?

24  A.  That's right.

25  Q.  Do you recall in the discussions which took place in the --

1   or your review of the e-mails and discussions which took place

2   from August 14th to about August -- or 13th maybe to about

3   August 17th when these matters were, at least for those days,

4   laid to rest, do you recall that there were various approvals

5   by SiteMaster with respect to some of these changes in means

6   and method of performance and the way the contract was to be

7   performed?

8   A.   Yes, there was some back and forth about these issues,

9   there are e-mails in there where SiteMaster agreed to these

10  things, and then later we see that payments were made as a

11  result of those agreements.

12  Q.   As a result of your review of that sort of series of

13  communications by mail and e-mail over that middle period of

14  August, were you able to determine whether or not in your view

15  from the communications there was an expectation by the parties

16  that they were going to still be able to complete the contract

17  in full by September 15th?

18  A.   No.   In fact, you see that it's obvious that both parties

19  knew that it wasn't going to be possible to complete on time,

20  so there was a lot of discussion about, "Okay, how much work

21  can we get done and how can we work together in order to

22  maximize performance," all the time realizing that it wasn't

23  going to be completed.

24  Q.   Do you recall in the e-mail that we were looking at a

25  moment ago that is joint exhibit 20, in addition to the areas

1  which we discussed, which starts with the e-mail from

2  Ms. Schaffer, the discussion -- I think you can get all the

3  words there -- the discussion in this top paragraph concerning

4  both demobilization and closeout payment issues?

5  A.  Yes.

6  Q.  And as you understood it, what were the issues being

7  addressed in that regard?

8  A.  Well, in the schedule of values, which perhaps you've

9  already seen, it lays out, it breaks the $1-million down into

10  various components, and part of the breakout is that at the end

11  of the job there is a sum paid to demobilize, which is just

12  like it sounds, to pack up and get ready to ship to go home,

13  and then also a lump sum for closeout.  Neither one of those,

14  demobilization or closeout, are connected to performance or

15  production on the project.  So there was some discussion about

16  whether those values would change at all because Global One

17  wasn't going to have enough time to complete the project.  If

18  we read this and follow through with some e-mails over the next

19  couple of days following this, we see that there were no

20  changes to the purchase order for the values associated with

21  demobilization and closeout.

22  Q.  In that regard, there was an e-mail the next day, was there

23  not?

24  A.  Yes.

25  Q.  Which addressed certain payments for paint and other

1    invoices that were specifically addressed and are referred to

2    in some of these bullet points here.  Do you see that?

3    A.  Yes.

4    Q.  And I'll just tell you, that's on August 16th at 4:01 p.m.,

5    so just after -- let me be sure about that before I say that --

6    yes, about four hours after Samantha Schaffer's e-mail at

7    12:04.  I'm sorry.  That would actually be before except that I

8    don't know if it takes into account the time difference, but

9    the e-mail that is being shown here, does that appear to be in

10   response to the issues addressed -- some of the issues

11   addressed on price and dollars in Ms. Schaffer's e-mail?

12   A.  Yes.  I mean, this is on Sunday, and as you track through

13   this, the discussions on this began on Friday and extended into

14   the weekend where, if you trace this through, there was going

15   to be some discussion about this.  Apparently there was.  And

16   the conclusion, as I understand it, is shown at the bottom

17   where Mr. Bigger is saying that, with regard to the

18   demobilization and closeout cost, the schedule of values shall

19   remain as is, meaning according to what they were in the

20   original purchase order.

21   Q.  Do you recall reviewing the award letter to see what the

22   contractual requirements were with respect to demobilization?

23   A.  Yes.

24   Q.  And generally speaking, was it as you described earlier?

25   A.  Yes.  I think what's important is that's what it's going to

1  take to shut the project down and get home.  It doesn't have

2  anything to do with how much painting was or was not

3  accomplished.

4  Q.  And with respect to the award letter, that is, exhibit 6 in

5  this case, did you also attempt to find any description of what

6  was required of Global One for the closeout milestone?

7  A.  No, there's no description for that.

8  Q.  And is it correct, sir, then that the only -- and I'll show

9  you what is a purchase order, up at the top dated August 5th of

10  2015.  Did you have an opportunity to review this purchase

11  order?

12  A.  Yes.

13  Q.  And, in fact, it represents -- there were two other prior

14  versions, but this is the last and the applicable version of

15  the milestones of the purchase order that are at issue in this

16  case, as you understand it; isn't that correct?

17  A.  Yes, that's correct.

18  Q.  And your opinions then were based upon the purchase order

19  milestones, or statement of values as they're sometimes

20  referred to, that are referred to here; is that correct?

21  A.  That's right.

22  Q.  And looking at milestone number 4, which relates to

23  anchors, can you see that that is where the $11,615 was

24  actually added to the change in the milestone payments?

25  A.  Yes.

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - DIRECT

35

1   Q.   Not an issue outside of the contract like the delays or

2   other changes, but here directly acknowledged by SiteMaster by

3   change in the milestone; correct?

4   A.   Yes.

5   Q.   And you also see that with respect to tower prep, tower

6   prime and tower paint, there are what I'll call incremental

7   amounts based on a per-foot charge; isn't that correct?

8   A.   Yes.

9   Q.   And did you understand from your review of the

10  documentation that from and after this purchase order time, it

11  would have been an understanding that for so many feet as are

12  completed, there is an entitlement to painted -- excuse me --

13  to be paid?

14  A.   Yes, that's right.  The line items there, 5, 6 and 7, are

15  directly connected to production based on how many feet have

16  been completed of each of those three items.

17  Q.   And not exclusively related to completion of all 827 feet

18  for the three categories?

19  A.   Yes.

20  Q.   And, in fact, do you recall again during those discussions

21  or e-mails back and forth in the mid point of August there

22  being specific discussions and references by SiteMaster that

23  there would be payment for as much painting as could be

24  completed by September 15th, even if not the entirety of the

25  contract?

1   A.   Yes.

2   Q.   And in that respect, is that written statement basically an

3   acknowledgment of what's found here in the purchase order

4   milestones?

5   A.   Yes.

6   Q.   Now, is there any question in your mind with respect to

7   some of these changes in means and methods of performance that

8   to the extent that they are recognized in the writings that

9   took place during the middle of August period, that those are,

10   in fact, changes to the contract?

11   A.   Yes, they are.

12   Q.   There's not a specified magic form by which changes are to

13   be made and approved, is there?

14   A.   No, there's not.

15   Q.   But so long as SiteMaster acknowledges in writing a change,

16   in your experience, is that, in the custom and practice in the

17   construction industry, a change to the agreement?

18   A.   Yes, it is, and especially when you couple that with

19   tendering a payment.  I mean, that's evidence to me that there

20   was an agreement.

21   Q.   Now, with respect -- we know in this case that there, of

22   course, were performance items performed under the milestones

23   that are part of this purchase order that is exhibit number 8

24   for which payment was not made; correct?

25   A.   Yes.

1   Q.   Nevertheless, is it your opinion, based on your review of

2   the records and your understanding in the industry, that for

3   work actually performed for these three milestones -- well, and

4   indeed for the anchors which are on a per-anchor basis -- that

5   if the work is performed and an invoice submitted for that,

6   that that would be consistent with the purchase order even if

7   not the entire contract is completed?

8   A.   Yes.  And we see a pattern of that because from early on

9   there were billings on the base contract that tie back to these

10  values; as so many feet were performed, so many feet were

11  billed, that number of footage was paid, and so forth as we go

12  through the contract time line.

13  Q.   So, not only would that be normal custom and practice in

14  the industry, but you have specific confirmation of it through

15  the invoicing and, at least early on, some payments?

16  A.   Yes.

17  Q.   Based upon your review of the documents, including invoices

18  and the purchase order and the contract documents and so forth,

19  did you conclude what the amount of unpaid -- well, let me ask

20  you.  You talked a moment about demobilization and closeout a

21  moment ago.  As a result of your review of the contract and the

22  award letter and the purchase order, did you make any

23  determination, based upon your understanding of the customs and

24  practices of the industry, whether it was appropriate that

25  those matters be invoiced and paid?

1   A.  Yes, I did.

2   Q.  And your opinion is that they have been invoiced and should

3   be paid?

4   A.  Yes, that's right.

5   Q.  After your review of the unpaid invoices and all the other

6   issues which you have considered in connection with this case,

7   did you arrive at a calculation of what you believe to be the

8   monies which should be paid to Global One in this case?

9   A.  Yes, I did.

10  Q.  And what was that -- well, let's just describe the

11  methodology first.  So, how did you make that determination

12  with respect to your damage calculations?

13  A.  Well, I first took a look at the base bid, which at this

14  point in the project is $1,011,615, and then asked myself,

15  based on all the other documents, what of those values would be

16  due, and so obviously due and already paid were milestone 1, 2

17  and 3.  Milestone 4 was completed and billed.  Portions of

18  milestone 5, 6 and 7 were billed.  And then Global One did come

19  back to the United States, and so I determined that they did

20  demobilize, they did closeout, so that would be due.  And then

21  I looked at all the documents to see what of those additional

22  amounts of the million dollars had been agreed to and decided

23  and picked out that these were obviously agreed to in terms of,

24  for instance, the cost to go from mitt painting to spray

25  painting, and the other delays that were agreed to that

 1   occurred and simply added all those up to come to a final

 2   number of this is what they earned by virtue of the contract

 3   and then subtracted what they had been paid, and so that

 4   rendered a balance due.

 5   Q.  And do you recall what that balance due was?

 6   A.  It's around $367,000.  I'd have to look in my report.

 7          **MR. McCANN:**  Your Honor, may the witness refresh his

 8   recollection in that regard?

 9          **THE COURT:**  Yes.

10   A.  My calculations were $367,987.

11   Q.  (BY MR. McCANN)  With respect to the invoices that were

12   unpaid and about which you've testified is your opinion that

13   consistent with the custom and practice in the industry and the

14   contract documents they should be paid, do you recall the

15   amount of the unpaid invoices?

16   A.  I'm referring to my report now where I did the

17   calculations.  The total unpaid invoices, including the base

18   bid on the million plus the changes that I thought were

19   appropriate, that was 242,923.87.  That is not in addition to

20   the 367; that's included inside the 367.

21   Q.  And the number which you have used there involves, if I

22   may, to again refresh your recollection, if you'll look to

23   section 1.3.1 of your opinion, and I'll have some questions for

24   you about it.

25   A.  Yes.

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - DIRECT

40

1  Q.  And those were the -- you've referred there specifically

2  to, as you look in that whole section, the change invoices, and

3  in both means and methods of performance and delay day

4  invoices, have you not?

5  A.  Yes.

6  Q.  And those total the $242,000 or so that you indicated;

7  correct?

8  A.  That's right.

9  Q.  Okay.  Now, we know that some of those invoices were

10  actually paid, weren't they?

11  A.  Yes.  In fact, all of those -- all those invoices except

12  for one had been approved and some of those had been paid.

13  Q.  Okay.  And with respect to all of those change invoices,

14  except the one, that was about a $5,000 one; correct?

15  A.  Yes.

16  Q.  What was the totals of all of those unpaid or paid change

17  invoices?

18  A.  202,436.56.

19  Q.  How then did you get from the 202,000 to a $242,000 number?

20  A.  Well, I took the $202,000 and put on a 20 percent overhead

21  and profit because these items, since they are over and above

22  the contract, it is standard in the industry for a contractor

23  to mark up those costs because that's how a contractor makes

24  money, is to put labor, material and other expenses into first

25  the subtotal and then mark that up, and that's how a profit is

 1   made.

 2       So, in my opinion, based on industry standard and common

 3   practice, that you would take these expenses, which total

 4   202,000 and some change, and add on what would be, in my

 5   opinion, a reasonable industry profit considering the stature

 6   and location of this particular project.

 7   Q.  In addition to the opinions which you have rendered so far,

 8   did you also have an opportunity to review what were claimed as

 9   damages by SiteMaster?

10   A.  Yes.

11   Q.  And in general, without reference to their specifics, which

12   we may discuss later, what documents did you review in order to

13   determine what those counterclaim damages were?

14   A.  Well, there was, in my file materials, there was a

15   statement, basically a damage statement, a one- or two-page

16   document from SiteMaster where they outlined what they felt

17   like they were due.

18   Q.  Okay.

19           **MR. McCANN:**  Your Honor, may I inquire just to be sure

20   that exhibit 37 is admitted?

21           **THE COURT:**  Joint?

22           **MR. McCANN:**  Yes.

23           **THE COURT:**  It is.

24           **MR. McCANN:**  There we go.

25   Q.  (BY MR. McCANN)  Is this the document you were referring

1  to, sir?

2  A.  Yes.

3  Q.  Now, this was provided to you -- by the way, your report is

4  dated in mid July; isn't that correct?

5  A.  Yes.

6  Q.  So this calculation of damages was reported or provided to

7  you sometime prior to the date of your report, July 18;

8  correct?

9  A.  Yes, that's right.

10 Q.  And by the way, that's July 18 of 2016; right?

11 A.  Yes.

12 Q.  You did this several months ago?

13 A.  Yes, that's right.

14 Q.  Now, at the time that this -- was this the only information

15 you had at the time you rendered your opinion with respect to

16 the matters that are addressed in this particular exhibit?

17 A.  Yes, it is.

18 Q.  And what did your review of this damages calculation

19 disclose and what did you determine with respect to it?

20 A.  Well, at the time that I wrote my report, this was just a

21 projection of what the expected costs were.  So, based on

22 number 1, there was -- I'm sorry -- yeah, based on the -- the

23 $73,520 was for an inspector to remobilize and go back to the

24 site.

25     The next value, 80,644.56, they're claiming as an offset,

1  but I think what's important about this is that that work that

2  that value describes had already been approved and paid

3  previously by SiteMaster.  So the way I interpret this in their

4  statement of damages is that they want to take that money back.

5          **MR. SHANK:**  May we approach, Your Honor?

6          **THE COURT:**  Yes.

7      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUT OF

8  THE HEARING OF THE JURY:)

9          **MR. SHANK:**  That's not our claim of damages.  He's

10  saying that's our statement of damages.  We're not claiming

11  that $80,000.  He wasn't here for the testimony, even though he

12  could have been and all of that, so he's talking about

13  projections.

14          **THE COURT:**  All right.  So, is there a different

15  document that they can use rather than this one?

16          **MR. SHANK:**  The testimony from Mr Chalker and

17  Mr. Bigger --

18          **THE COURT REPORTER:**  Pardon me.  You need to speak up,

19  please.

20          **THE COURT:**  Mr. McCann, will you be able to question

21  the witness using the testimony that Mr. Bigger and Mr. Chalker

22  gave?

23          **MR. McCANN:**  I think I should be able to do that.  But

24  I think it's also important, there's another one after this

25  which was provided in discovery that's also admitted.

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - DIRECT                    44

```
 1          THE COURT:  But the pretrial order trumps everything
 2   else.  They said in the pretrial order they're seeking 900,000.
 3   That was in the statement of the case I gave the jury.  So,
 4   whatever comprises the 900- that they're claiming now is what
 5   you should be questioning on; otherwise, we're going down
 6   rabbit trails based on what they're asking for.
 7          MR. McCANN:  Okay.
 8          THE COURT:  Do you have a statement of what --
 9          MR. McCANN:  I wrote --
10          THE COURT:  You wrote it down.
11          MR. McCANN:  -- it down.  I think it's actually
12   953,000 or something.
13          MR. SHANK:  I'll double check.  I think it's 956-,
14   something like that.
15          THE COURT:  So if you can get your notes of that.
16          MR. McCANN:  Yes.
17          THE COURT:  Thank you.
18          MR. SHANK:  Thank you.
19     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN
20   THE PRESENCE AND HEARING OF THE JURY:)
21   Q.  (BY MR. McCANN)  You were aware before we started your
22   testimony here that, of course, there's been testimony in this
23   trial from Mr. Chalker about what the current claim for damages
24   is; do you understand that?
25   A.  Yes.
```

1    Q.  Let me advise you, and you may want to make a note of some

2    of these numbers if you've got any questions, that Mr. Chalker

3    testified that the costs of the Allstate contract, which is the

4    successor contractor, were $653,000.  He also testified that

5    there was an additional $300,000 --

6              **THE COURT:**  305-.

7              **MR. McCANN:**  I'm sorry?

8              **THE COURT:**  305,000.

9              **MR. McCANN:**  Oh, okay.

10   Q.  (BY MR. McCANN)  Well, after he itemized it, he indicated,

11   I believe, $7,000 for additional engineering costs; $54,000 for

12   additional CorroMetrics inspector costs; $48,000 for logistics

13   costs; $80,000 for SiteMaster direct labor for three persons,

14   for the three persons who went to the Niscemi site; and

15   $116,000 of SiteMaster overhead.  And I'll tell you that my

16   notes reflect that, other than those numbers, he did not

17   otherwise identify anything about it except the source of the

18   payment.  Okay?  For a total of, I have, as 958-.

19       Sir, with respect -- let's begin first with the overarching

20   question, and although the monetary amount has changed slightly

21   from the time that you did your report, based upon your review

22   or now understanding of those amounts of the claim, do you have

23   any opinion as to whether or not those amounts that are

24   reflected there should be the responsibility of Global One?

25   A.  They should not.  They are not the responsibility of Global

1  One.

2  Q.  And why?

3  A.  Because, again, had Global One had the time that was

4  allotted under their contract, which was 99 calendar days, if

5  they had had that time available to them, they could have

6  completed the project as they originally planned; there would

7  be no need to send someone back to complete the project.  So,

8  it's not their responsibility that the delays occurred, and

9  it's not their responsibility that it's going to cost this

10  amount of money to finish the job.

11  Q.  Sir, did you review records that were provided to you that

12  caused you to conclude the percentage of the work that was

13  completed by Global One of Global One's contract?

14  A.  Yes.

15  Q.  And what did you determine in that regard, and explain how

16  you came to that conclusion.

17  A.  Well, I did three different things to try to determine what

18  was the extent of completion at the time they had to leave the

19  project, and there's three sources there.  One is when we look

20  at the job site reports that were recorded contemporaneously by

21  SiteMaster, their project manager, that shows that the project

22  was -- that Global One's work was 55 percent complete on

23  September 15th.

24      Another reference is there is a construction schedule that

25  was put out by SiteMaster's project manager that shows, again

 1   contemporaneously during the project, that Global One's work

 2   was 57 percent complete at the time they left.

 3        And then a third method of looking at it is when you look

 4   at Allstate's proposal, that being the contractor that actually

 5   went back to finish the job, if you look at their bid proposal,

 6   how it's explained, what they're going to do, and what's

 7   already complete, I mean, by default, it says these are the

 8   things that need to be done to complete it, and so you come

 9   back into that and say, well, if these -- I'll make up a

10   number -- if there's 10 things and six things need to be

11   completed, then you can infer that four of them must be done.

12   And when you go through and analyze those four from a dollar

13   value of what they're worth, looking at the original schedule

14   of values again, what was set out very early on, what are the

15   values of that work, and you take what was completed and

16   apparently didn't need to be addressed at all and divide that

17   by the total amount of money in the contract, it brings you to

18   about the same point of completion.

19        And so there's three methods that show that they were

20   somewhere between 54 to 57 percent complete on September 15th.

21   Q.  Let me just show just for a moment the joint exhibit

22   35.  Is this the Allstate proposal that you were referring to

23   with the different amounts that they were required to do?

24   A.  Yes, it is.

25   Q.  And when you said there was a -- I don't remember if you

1  called it a construction schedule or something else that you

2  determined was a 57 percent amount?

3  A.  Yes, a construction schedule.

4       **MR. McCANN:**  Your Honor, may I approach for a moment?

5       **THE COURT:**  Approach me?

6       **MR. McCANN:**  Yes.

7       **THE COURT:**  Sure.

8    (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUT OF

9  THE HEARING OF THE JURY:)

10      **MR. McCANN:**  The critical path --

11      **THE COURT:**  Right.

12      **MR. McCANN:**  -- which I think is what this is, and I'm

13  going to be talking about that, that was provided to us I think

14  on -- I don't know -- it was sometime in September, after that,

15  but he was provided another copy and I think it's admitted and

16  I think he's entitled to --

17      **THE COURT:**  I was waiting for him to say the words

18  "critical path."

19      **MR. SHANK:**  I was waiting for hopefully the words

20  "mid-morning break," per chance?

21      **THE COURT:**  Aren't we close?

22      **MR. McCANN:**  We're pretty -- I don't know.  I mean,

23  every day is a new day.  Maybe 20 minutes.

24      **THE COURT:**  Okay.  So, yeah, let him look at it on the

25  break.

1        **MR. McCANN:**  Okay.  Thank you.

2     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

3  THE PRESENCE AND HEARING OF THE JURY:)

4        **THE COURT:**  Ladies and gentlemen, we're going to take

5  our mid-morning recess for 15 minutes.  Please do not discuss

6  the case on the recess.  Thank you.

7     (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING PROCEEDINGS

8  WERE HAD IN OPEN COURT, WITHIN THE PRESENCE AND HEARING OF THE

9  JURY:)

10       **THE COURT:**  Mr. McCann.

11       **MR. McCANN:**  Thank you, Your Honor.

12  Q.  (BY MR. McCANN)  Mr. Berryman, just before the break, you

13  were talking about a construction schedule that you reviewed.

14  Do you recall that?

15  A.  Yes.

16  Q.  And you indicated that -- well, first of all, is this the

17  construction schedule which you reviewed?

18  A.  Yes, it is.

19  Q.  And are you familiar with the term "critical path"?

20  A.  Yes.

21  Q.  Some witnesses have referred to this document in that

22  respect.  Is that a term acceptable to you, as well?

23  A.  Yes.

24  Q.  And I believe you indicated to us that your recollection,

25  without seeing the exhibit, was that you had reviewed it and

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - DIRECT                    50

1  that there was 57 percent completion of the painting phase.  Do

2  you see that?

3  A.  Yes.

4  Q.  And, in fact, do you see that actually the 57 percent

5  refers just to the completion of the lead renovation and

6  surface preparation line?  Do you see that?

7  A.  Yes.

8  Q.  And can you review from here, based on the total tower

9  painting phase, what the percentage of completion is indicated?

10  A.  Yes.  It's in the bolded print where it says "Tower

11  Painting Phase" and out to the far right it says "59 percent."

12  That is basically an averaging of all the lines below.  You see

13  several are at 100 percent, one is at 57 percent, two are at 35

14  percent.  So the aggregate job that Global One would have been

15  responsible for is at 59 percent.  That's the top number in the

16  upper right-hand corner.

17  Q.  And with respect to that number, did you also -- that's one

18  of the numbers that you used along with the 55 percent from the

19  construction report and the one other thing which -- oh,

20  comparing the Allstate proposal and so forth that you used to

21  determine that that appears to be an accurate number?

22  A.  That's right.

23  Q.  And with respect to the Allstate proposal, there you're

24  actually looking at number of feet remaining to be accomplished

25  and figuring out what happens with these numbers if that's all

1  that's remaining; correct?

2  A.  Yes.  By taking, you know, a bid from a contractor that

3  says, "Well, here's what's left to be done," then a person

4  could, by inference, determine what has been done that's

5  acceptable and then do the math to figure out what's been

6  completed and what's left to complete.

7  Q.  And all three of those numbers lead you to what conclusion,

8  based on your experience and background in the industry, of the

9  extent to which the tower painting phase was completed?

10  A.  I would say from those three reference points that it was

11  about 55 to 59 percent complete.

12  Q.  I want to show you, sir, what's previously been marked as

13  plaintiff's exhibit 96.  Do you see that, sir?

14  A.  Yes.

15  Q.  And I want to go over with you the invoices in this case

16  which remain unpaid.  Do you understand that the invoices in

17  this case that remain unpaid, as indicated in exhibit 22, are

18  the invoices numbered 12 through 16 inclusive?

19  A.  Yes, that's right.

20  Q.  And, sir, during the opportunity we had for a break here,

21  did you sum the total amount of the unpaid invoices?

22  A.  Yes.

23  Q.  And do you recall, sir, that that was a sum total of

24  $329,511.21?

25  A.  Yes, that's right.

1  Q.  And that would represent an amount which, if I understand

2  it correctly in your view, for the work performed and milestone

3  items completed, that Global One is entitled to recover because

4  they were not permitted the extra 46 days to complete the

5  contract?

6  A.  That's right.

7       MR. McCANN:  I have no more questions of the witness,

8  Your Honor.

9       THE COURT:  Thank you.

10     Cross-examination?

11       MR. SHANK:  Thank you, Your Honor.

12                      CROSS-EXAMINATION

13  BY MR. SHANK:

14  Q.  Mr. Berryman, you offered up a definition in your testimony

15  earlier this morning that I thought was pretty handy.  You said

16  the scope of work is what you're supposed to do.  Do you

17  remember that?

18  A.  Yes.

19  Q.  And you testified several times that over the course of

20  this project, based on all your experience in the construction

21  industry and your review of all these documents, the scope of

22  work changed several times.  Do you remember that?

23  A.  Yes.

24  Q.  Will you define for me the scope of work in this project.

25  A.  Well, generally speaking, it was to repaint the tower and

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - CROSS

53

```
 1   the anchors.
 2   Q.  Did that change, in your estimation, at any point in time
 3   during this project?
 4   A.  Well, as I said, that's a general way of stating it.  I
 5   think if you get out the contract documents and look at the
 6   section that's called "Scope of Work," it outlines in greater
 7   detail what that scope is and what the parties had contemplated
 8   on how that scope was to be done, the means and the methods,
 9   the sequencing.
10   Q.  I want to stop you right there because you just walked into
11   that second handy definition you gave us earlier today.  How
12   things are to be done are the means; correct?
13   A.  Yes.
14   Q.  Scope is "what" and not "how"; correct?
15   A.  Well, generally speaking, yes.  I mean, sometimes those
16   lines are blurred in the industry as to which is scope and
17   which is means.  I mean, they're intertwined, they're not
18   always separate.
19   Q.  But in your testimony earlier today, there were very clear
20   definitions for both; right?
21   A.  Yes, I said two clear definitions, but I also maintain that
22   they're not completely separable.
23   Q.  Do you remember taking your deposition in this matter with
24   me?
25   A.  Yes.
```

```
 1              MR. SHANK:  Your Honor, may I approach --

 2              THE COURT:  Yes.

 3              MR. SHANK:  -- my table?

 4    Q.  (BY MR. SHANK)  A moment ago when I asked you to tell us

 5    your understanding of the scope in this project in this

 6    project, the "what" that was to be done, you made that simple

 7    statement about repaint the tower and the anchors; you remember

 8    that?

 9    A.  Yes.

10    Q.  And then you said there were some other things that were

11    included in the scope; you remember that?

12    A.  Yes.

13              MR. SHANK:  Counsel, page 50.

14    Q.  (BY MR. SHANK)  Do you remember testifying in your

15    deposition:

16         "Q.  What was the scope of work for the tower project

17    with regard to Global One?

18         "A.  It's shown on page 1 of the SiteMaster award

19    letter dated April 1st, 2015.

20         "Q.  Where?

21         "A.  On page 1.

22         "Q.  Okay.  What's your understanding of the scope of

23    work requirement for Global One on the tower project?

24         "A.  To completely repaint the tower.  The tower

25    should be cleaned free of any loose or flaking paint using lead
```

 1  abatement procedures, an epoxy primer and urethane color

 2  coating should then be applied, include painting of corroded

 3  areas at all guy anchors.

 4          "Q.  So that's the scope of work for Global One on the

 5  tower project; correct?

 6          "A.  Yes."

 7      Do you remember giving that testimony?

 8  A.  Yes.

 9  Q.  When you gave that testimony, you were under the same oath

10  that you are today; correct?

11  A.  Yes, but you offered --

12  Q.  You've answered my question.

13  A.  -- you offered a very specific --

14          **THE COURT:**  Sir, sir, you've answered his question.

15  Your lawyer can ask you a question later.

16  Q.  (BY MR. SHANK)  And it's still your testimony in front of

17  this jury today that the "what" that Global One was required to

18  do in Italy changed several times; correct?

19  A.  Yes.

20  Q.  Remember when you testified earlier this morning and you

21  said that the contract contemplated six to eight crew members

22  on the project for Global One?

23  A.  Yes.

24  Q.  And you said, based on that requirement, it would be

25  impossible for them to finish the project based on the delay

1   days.  Do you remember that?

2   A.  Yes.

3   Q.  The contract didn't really require them to have a number of

4   crew members, did it?

5   A.  I don't know that you can say that it's a requirement.  I

6   mean, it's definitely mentioned in the contract documents.

7          **MR. SHANK:**  Pardon me, Your Honor.

8   Q.  (BY MR. SHANK)  Let's look again at your testimony under

9   oath at deposition on page 14, line 1.

10          "Q.  Okay.  So you've said that they provided the

11   number of people that they said with the proposal and required

12   by the contract; correct?

13          "A.  Well, the number of people wasn't required by the

14   contract.  All that was required by the contract was to

15   complete the work in 99 days."

16      Do you remember testifying to that effect?

17   A.  Yes.

18   Q.  In discussing your opinion based on whether delays were

19   appropriate in this matter for Global One, you mentioned the

20   alteration of the sequencing work on the tower; do you remember

21   that?

22   A.  Yes.

23   Q.  And that's a change in the means and the methods; correct?

24   A.  It's not so much the means and methods but the sequencing

25   of what was contemplated by the parties.

 1          **MR. SHANK:**  Counsel, on page 68.

 2    Q.  (BY MR. SHANK)  Back to your deposition under oath, line

 3    11.

 4          "Q.  And altering from this sequencing in your opinion

 5    is a change of the scope of the work; correct?

 6          "A.  Well, it's -- I would say it's more a change to

 7    the means and the methods or the procedures which affect

 8    performance and efficiency."

 9      Do you remember testifying to that effect?

10    A.  Yes.  Sequencing means --

11    Q.  You've answered my question.  Thank you.

12      Do you remember testifying here earlier this morning that

13    the invoice you analyzed concerning payment for the switch from

14    mitt spray -- mitt painting to spray painting was not

15    contemplated in the scope of work?  Do you remember that?

16    A.  Yes.

17    Q.  So that was not a change in the scope of work; correct?

18    A.  It is not a change in terms of generally speaking that

19    you're supposed to paint the tower and the anchors.  It did

20    change what was contemplated by the parties, as is expressed in

21    the contract.

22    Q.  My question was simply:  The change from mitts to spray

23    guns is not a change in the scope of work; correct?

24    A.  No, I don't think that's correct.  And I can explain if

25    you'd like for me to.

1  Q.  Even though you testified earlier today that there's no

2  reference to mitt or spray painting in the scope of work; do

3  you remember that?

4  A.  No.

5  Q.  Mr. Berryman, in your 38 years of experience in the

6  construction industry, have you ever seen instances where a

7  general contractor reclaims portions of a previous payment to a

8  subcontractor at the end of a contract based on that

9  subcontractor's failure to perform?

10 A.  I probably have seen that in my career, I've seen someone

11 attempt to do that.

12 Q.  Let's look back at your deposition under oath.

13        **MR. SHANK:**  Counsel, page 119, starting at line 16.

14        "Q.  Mr. Berryman, in your experience in the

15 construction industry, have you ever come across an occasion to

16 see where a general contractor may seek to reclaim portions of

17 pay applications based on a subcontractor's failure to perform

18 at the end of a contract?

19        "A.  Yes, I probably have.  I can't think of a

20 specific instance."

21     Line 5 on page 120:

22        "Q.  Well, as the prime contractor, you've made

23 payments to a sub over the course of a project, you've come to

24 the end of the project and performance of that sub is an issue

25 and so any remaining payments withheld by the general would

 1  make a claim, kind of a claw-back of previous payments based on

 2  that sub's poor performance?

 3          "A.  Well, I want to make sure I'm answering your

 4  question because if you're saying, leaving change orders out of

 5  this for just a minute, if you're saying that you've got a

 6  contract, you've got a million-dollar contract and you've paid

 7  $800,000 in this scenario and you've come to the end of it and

 8  you say to your subcontractor, 'Not only do I want -- not only

 9  am I not going to pay you the last 200,000 I owe you but I'm

10  going to claim 100,000 of the 800- that I have paid to you for

11  some reason,' is that what you're asking?

12          "Q.  Yes.

13          "A.  Yes, of course that happens from time to time."

14      Do you remember that testimony?

15  A.  Yes.

16  Q.  Mr. Berryman, I would like to draw your attention to

17  exhibit 8 so we can look at that final milestone one more time.

18          **MR. SHANK:**  Ms. Lynn, are we -- thank you.

19  Q.  (BY MR. SHANK)  I would like you to pay particular

20  attention to the first three milestones.  Based on all of your

21  construction experience, your analysis of the documents in this

22  case, would you please tell the jury how Global One would get

23  paid for milestone 3 under this milestone.

24  A.  They would complete mobilization.

25  Q.  Well, what about signing the contract?

1  A.  Well, you said milestone 3, didn't you?

2  Q.  Yes, sir, I did.

3  A.  Milestone 3 is mobilization, travel, $100,000.

4  Q.  Is it your testimony in front of this jury that they

5  wouldn't have to sign a contract before they got to milestone

6  3?

7  A.  Well, the contract doesn't say anything about -- even

8  though these are set up as 1, 2, 3, 4, 5, it doesn't say

9  anything about they necessarily have to be done in that order.

10 Q.  Oh, so you would expect SiteMaster to pay Global One for

11 flying to Italy without signing a contract; is that your

12 testimony?

13 A.  Well, it's a hypothetical, it's not likely to happen, but

14 for whatever reason if the contract wasn't signed and they

15 traveled, it would be something that they would be due, it

16 would be something that they earned according to the schedule

17 of values.

18 Q.  So, payment of milestone 3 does not require completion of

19 payments of milestone 1 or 2?

20 A.  There's nothing in the contract documents that indicate

21 that, no.

22 Q.  And nothing in your 38 years of experience would inform

23 that answer?

24 A.  As I said, it's not likely they would do anything until the

25 contract is signed, but this is based on did you do the work,

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - CROSS                                   61

 1  did you do what's described here, if you did then you get paid

 2  for it.

 3  Q.  And you just pick whichever one you want to get paid and

 4  you get paid?

 5  A.  No, but let's say that a couple of these are out of order,

 6  prime versus paint, this is not set up to indicate you're

 7  supposed to necessarily do it in this step because obviously

 8  when you look at 5, 6 and 7, they were doing prep, paint and

 9  prime sometimes all at the same time, and so this is just a

10  schedule, this is what you get to charge as you complete these

11  various items.

12  Q.  Mr. Berryman, in your 38 years of experience in the

13  construction industry, have you ever worked on a project for

14  the Navy?

15  A.  No.

16  Q.  In your 38 years of experience in the construction

17  agency -- industry, have you ever worked internationally?

18  A.  No.

19  Q.  In your 38 years in the construction industry, have you

20  ever worked on a tower painting project?

21  A.  No.

22  Q.  In all of your experience testifying with regard to the

23  construction industry, have you ever testified in a case

24  concerning SSPC standards?

25  A.  Not that I know of.

Global One v SiteMaster (12-09-2016 Jury Trial - Volume V)
MICHAEL JAMES BERRYMAN - CROSS                                62

1  Q.  Notwithstanding all that, am I correct that in your opinion

2  you find none of the delays in this project were caused by

3  Global One?

4  A.  That's correct, they were not.

5  Q.  Thank you.

6     Am I correct that you find no fault with Global One

7  concerning the tower project?

8  A.  That's correct.

9         **MR. SHANK:**  Pass the witness, Your Honor.

10        **THE COURT:**  Anything further?

11        **MR. McCANN:**  No, Your Honor.

12        **THE COURT:**  All right.  Thank you.

13    May the witness be excused?  May he leave the city?

14        **MR. McCANN:**  May I confer with the witness for just a

15  moment?

16        **THE COURT:**  Yes.  Why don't you step down.  Thank you.

17                      *    *    *

18                   **REPORTER'S CERTIFICATION**

19    I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

20  TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

21
                   CERTIFIED:   *s/Greg Bloxom*
22                              Greg Bloxom, RMR, CRR
                               United States Court Reporter
23                              333 W. 4th Street, RM 4-548
                               Tulsa, OK 74103
24                              (918)699-4878
                               greg_bloxom@oknd.uscourts.gov
25